# CHARLESTON.

### STATE *v.* EHRLICK.

Submitted June 6, 1908. Decided May 11, 1909.

1. DISTRICT AND PROSECUTING ATTORNEY—*Authority—Civil Proceedings.*

   The prosecuting attorney of a county has authority, independent of the Attorney General, to institute and prosecute all criminal actions and proceedings, cognizable in the courts of his county; but has no such power or authority, respecting the prosecution of civil proceedings on the part of the state, beyond that expressly conferred by statute. (p. 702.)

2. ATTORNEY GENERAL—*Powers and Duties.*

   As the chief law officer of the state, the Attorney General is clothed and charged with all the common law powers and duties, pertaining to his office, except in so far as they have been limited by statute. (p. 702.)

3. SAME.

   In the absence of any statutory provision to the contrary, the Attorney General has the management and control of civil litigation on behalf of the state. (p. 704.)

4. STATES—*Bill in Equity—Pleading—Demurrer.*

   A bill in equity on behalf of the state, signed by counsel other than the Attorney General, is not demurrable for lack of disclosure on its face of authority or direction from him to file the same. Such an objection must be raised by a motion to dismiss or plea in abatement. (p. 705.)

5. EQUITY—*Jurisdiction—Charge of Criminal Nature.*

   If a charge is of a criminal nature, or an offense against the public, and does not touch the enjoyment of property, or health, it is not within the jurisdiction of a court of equity. (p. 705.)

6. NUISANCE—*Abatement—Jurisdiction.*

   Equity has no jurisdiction to abate a public nuisance, either civil or criminal, at the instance of an individual or the state, not affecting or injuring the enjoyment of property or other personal rights. (p. 706.)

7. SAME—*Public Nuisances.*

   In so far as a public nuisance injures property or substantially interferes with the enjoyment thereof, directly or indirectly, or constitutes a purpresture, excluding citizens from

the enjoyment of their civil rights in highways and other pub-
lic grounds' and places, or obstructing or interfering with the
execution of the public business, it is abatable by injunction.
(p. 707.)

8. INJUNCTION—*Criminal Acts.*
   If an injunction is necessary and proper for the protection of
   such rights, criminalty of the injurious act does not bar the
   remedy in equity. (p. 707.)

9. NUISANCE—*Keeping of Gaming House—Abatement in Equity.*
   Though the keeping of a gaming house is a criminal nuisance,
   punishable and abatable by indictment and conviction, there
   is no jurisdiction in equity to abate it, at the instance of either
   an individual or the state, unless it appears to be injurious to
   personal or property rights and the injury is not otherwise
   adequately remediable. (p. 712.)

10. EQUITY—*Jurisdiction—Criminal Remedies—Sufficiency.*
    Criminal remedies and procedure must be deemed adequate
    to the maintenance of the public right, in respect to moral and
    political principles, except in so far as the legislature may
    have provided others, since that body, having plenary power
    over such matters, has seen fit to rely upon existing remedies,
    and courts of equity are powerless to ordain jurisdiction for
    themselves. (p. 711.)

Appeal from Circuit Court, Brooke County.

Bill by the State against George Ehrlick and others. Decree
for plaintiff, and defendants appeal.

*Reversed and Bill Dismissed.*

J. J. CONIFF, for appellants.

WM. G. CONLEY, Attorney General, and H. M. RUSSELL, for
the State.

POFFENBARGER, JUDGE:

On a bill, purporting to be that of the State of West Virginia,
not signed, however, by the attorney general, nor showing, in any
way, that that officer authorized the filing of the same, but signed
by the prosecuting attorney of a county, and an individual, de-
scribing himself as attorney for the state, the circuit court of
Brooke county awarded a preliminary injunction, inhibiting the
defendants, George Ehrlick and others, from carrying on, or
conducting, what is known as a "Turf Exchange" in said county,
extensively resorted to by people from other counties and states,

for the purpose of betting on horse races, occurring in different parts of the country, and reported by telegraph. On the maturing and submission of the cause to the court, a decree was made, perpetuating the injunction, from which the defendants have appealed.

The first objection to the bill is its failure to disclose any direction by the attorney general to institute the suit, his employment of counsel therefor, or his assent to the prosecution thereof, the record being entirely silent as to his attitude. Much authority is cited, indicating power and authority in the attorney general to institute suits on behalf of the state, in proper cases, and the propriety of his doing so, but none indicating that such suits cannot be instituted by the prosecuting attorney of the county, either by virtue of his office, considering it as being independent of, and not subordinate to, that of the attorney general, or regarding it as a subordinate office in the executive department of justice of the state. The relation of the two offices to one another, their respective powers and duties and the nature of the litigation all enter into the solution of this question. The office of attorney general is of very ancient origin and its duties and powers were recognized by the common law. That of prosecuting attorney is of modern creation, it seems, and its powers and duties are given, imposed and prescribed by statutory law. 4 Cyc. 1028; *Attorney-General* v. *Forbes*, 2 Myl. & C. 129. Prosecuting attorneys are generally described as deputies or assistants of the attorney general, 4 Am. & Eng. Ency. Law 1026; but they are not dependent upon him for their powers in all cases nor in all respects subject to his control. 23 Am. & Eng. Ency. Law 275. In the exercise of his common law powers, the attorney general may, no doubt, advise the prosecuting attorney, as he does other officers, since he is regarded as the chief law officer of the state. As the constitution and laws of the state make the two offices separate and distinct and vest in the prosecuting attorney certain powers and impose upon him certain duties, it seems clear that the attorney general cannot strip him of the powers expressly given, nor increase the burdens laid upon him. The sense in which the local officer is subordinate to the general one seems to be that they are engaged in the same branch or department of the public business. This makes the relation theoretical, rather than practical. The business, once pertaining

actually as well as theoretically to the office of attorney general, has been divided between the two offices for purposes of convenience. We may say the office of prosecuting attorney has been carved out of that of attorney general and made an independent office, having exclusive control, to some extent, of business of the state, arising within the county. No doubt the attorney general may assist the prosecuting attorney in the prosecution of such business, or perform it himself, in case of the non-action of the prosecuting attorney, but he cannot displace that officer. He has neither power of removal nor control over him within his own province, so far as it is defined by statute, for, if the division of powers, made by the statute, were not respected nor observed, nor susceptible of enforcement, the object and purpose of the division would be defeated. There would be no individual responsibility, if the powers of the attorney general and prosecuting attorney were co-extensive and concurrent. The one would be no more responsible than the other for the non-enforcement of the laws. Concurrence would produce interference, conflict and friction in many instances, delaying the disposition of business to the detriment of the state. We think it plain, therefore, that, in a practical sense, the two officers are distinct and independent. But all the business does not seem to have been divided. Part of the civil business of the state in the county seems to have been reserved to the attorney general. Section 6 of chapter 120 of the Code defines generally the duties of the prosecuting attorney, in the following terms: "It shall be the duty of every prosecuting attorney in this State, to attend to the criminal business of the State in the county in which he is elected and qualified, and also to civil cases in which the State is interested in such county, when required by and under the direction of the auditor; and when he has information of the violation of any penal law committed within his county, shall institute and prosecute all necessary and proper proceedings against the offender and may in such case issue or cause to be issued a summons for any witness he may deem material. He shall also represent the county in all suits and proceedings for and on behalf of or against the county, or county court, overseers of the poor, or other public authorities of the county, and carefully look after and give attention to the general interests of the county." His authority extends to all the criminal busi-

ness of the state in his own county. As to civil business in which the state is interested, he can act, on behalf of the state, only when required by the auditor and under the direction of the latter, or when the duty is enjoined by some statute. There are many other provisions imposing specific duties, concerning particular matters, but there is no statute giving him power to represent the state generally in respect to its civil business.

The conclusion just stated implies that the authority of the prosecuting attorney to institute this suit depends upon its character. If it is a criminal proceeding, he had such authority, but, if it is a civil one, he had not, unless it was given by the auditor, and, in the latter case, an inquiry might arise as to whether the auditor is chargeable with any duty or given any authority respecting a matter of this kind. As the bill was framed and is now regarded by its defenders, it is a criminal information, filed for the purpose of enforcing the criminal law. If it can be maintained as such, the filing and prosecution thereof are within the statutory jurisdiction and power of the prosecuting attorney; but, if the procedure is not authorized by the criminal law, nor its object within the auditor's power of direction, it should have been instituted by the attorney general. Whether the absence of the signature of the latter to the bill, or the lack of disclosure in the bill of his direction to institute the suit, makes the pleading bad on demurrer, is the question most extensively discussed in the briefs, but no authority for any of the contentions is cited. It seems to us, however, that such an objection ought to be raised by a plea in abatement or motion to dismiss. It is not the bill of the attorney general. The State of West Virginia is the plaintiff and there is a presumption that no attorney would institute such a suit without authority. It would be inconsistent with his duty and obligation as an officer of the court. When the question is properly raised, the authority of the attorney must be shown, *Mullin* v. *United States*, 118 U. S. 271; *Railroad Co.* v. *United States,* 108 U. S. 512; but we think the question was not properly raised.

The charge against the defendants is the keeping and conducting of a gaming house, constituing a public nuisance. Nothing of detriment to the community or the public at large is alleged against them other than the unlawfulness of the enterprise. The bill says they take dishonest profits from the betting and carry

it on with great profit to themselves, and at slight risk of loss. It is not alleged that anybody's property is injured, or that the place is in any sense disorderly. The theory of the bill, adhered to in the argument, is that the enterprise, tending to corrupt the morals of the public, makes it a nuisance, abatable by injunction.

Jurisdiction in equity to abate nuisances is undoubted and of universal recognition. It is equally well settled that the state may institute suits for that purpose in proper cases. But it is nowhere asserted that either the state or a private individual may maintain such a suit in any and all cases of nuisance. In other words, relief in equity by abatement is not the necessary sequence of the establishment of the charge of nuisance. Some nuisances are criminal while others are not. Criminal nuisances are abatable by criminal process, and, where this process is adequate, jurisdiction in equity fails; either because adequate legal remedy precludes jurisdiction in equity, or the subject matter is beyond the scope of equity jurisdiction. If a nuisance, purely criminal, injures or affects a private plaintiff in certain respects, he may resort to equity for relief, but the existence of neither a civil nor criminal public nuisance necessarily calls for interposition by a court of equity. A private person cannot abate it, unless it is specially injurious or prejudicial to him, and the state cannot proceed against it in equity, if it be merely a criminal nuisance, unattended by injury to a personal or property right of some sort, creating necessity for prevention of irreparable injury.

"The cases in which chancery has interfered by injunction, to prevent or remove a nuisance, are those in which the nuisance has been erected to the prejudice or annoyance of a right which the other party had long previously enjoyed. It must be a strong and mischievous case of pressing necessity, or the right must have been previously established at law, to entitle the party to call to his aid the jurisdiction of this court." *Van Bergen* v. *Van Bergen,* 3 Johns. Chy. Rep. 287; *Fisk* v. *Wilber,* 7 Barb. 395; *Kingsbury* v. *Flowers,* 65 Ala. 479. "To obtain relief in equity for a private nuisance, the threatened injury must be irreparable, incapable of compensation in damages, and not doubtful or contingent." *Green* v. *Lake,* 54 Miss. 540. "There is no case for equity, unless the charge be for injury to the enjoyment of property or other personal rights." *Sparhawk* v. *Railway Co.,* 54 Pa. St. 401. "It is elementary law that the subject matter of

the jurisdiction of the court of chancery is civil property. The
court is conversant only with questions of property and the main-
tenance of civil rights. Injury to property whether actual or
prospective, is the foundation on which the jurisdiction rests.
The court has no jurisdiction in matters merely criminal or
merely immoral, which do not affect any right to property. Nor
do matters of a political character come within the jurisdiction
of a court of chancery. Nor has the court of chancery jurisdic-
tion to interfere with the public duties of any department of
government, except under special circumstances, and where nec-
essary for the protection of rights of property." *Sheridan* v.
*Colvin,* 78 Ill. 237, 247; *People* v. *Condon,* 102 Ill. App. 449,
457; *Ocean City Ass'n.* v. *Schurch,* 57 N. J. Eq. 264. "If a
charge be of a criminal nature, or an offence against the public,
and does not touch the enjoyment of property, it ought not to
be brought within the direct jurisdiction of this court, which
was intended to deal only in matters of civil right resting in
equity, or where the remedy at law was not sufficiently adequate;
nor ought the process of injunction to be applied, but with the
utmost caution. It is the strong arm of the court, and to
render its operation benign and useful it must be exercised with
great discretion, and when necessity requires it." *Attorney-Gen-
eral* v. *Ins. Co.,* 2 Johns. Chy. R. 378; *Railroad* v. *Prudden,* 20
N. J. Eq. 530, 536. "A court of equity has no jurisdiction in
matters merely criminal or immoral. It leaves the discretion
of these matters to the criminal courts. The remedy at law is
presumed to be adequate, but if it is not so, the relief must come
from the law-making power and not from the courts." *People*
v. *Condon,* 102 Ill. App. 449, pt. 4 Syl.; *Cope* v. *Fair Ass'n,* 99
Ill. 489; *Attorney General* v. *Ins.* Co., 2 John. Chy. R. 371.

The text in Story's Equity Jurisprudence, sections 921 to 924,
according equity jurisdiction great latitude to interfere, by in-
junction, to abate nuisances, is to be taken and understood not
literally, but subject to the principles above stated. Although
the language of these sections is very broad, it does not import
in terms jurisdiction in equity to enforce the criminal laws or
to interfere where the purpose is other than the vindication of
personal and property rights. The English decisions referred
to by Story as showing the ancient origin of such jurisdiction,
at the suit of the attorney general, all had such objects. None

of them contemplated mere enforcement of criminal laws or the maintenance of public policy. *Attorney General* v. *Cleaver,* 18 Ves. Jr. 211, had for its object the inhibition of the manufacture of soap and the preparation of materials, used in the manufacture thereof, in a certain place, on the ground that it was offensive and injurious to the health of the inhabitants of the community. No questions of morality or criminality entered into the cause. The court, having concluded that the carrying on of such a trade was not *per se* a nuisance, directed an issue to a jury to determine whether it was in fact a nuisance. *Attorney General* v. *Forbes,* 2 Myl. & C. 123, related to a public highway, its object being to prevent, by injunction, municipal authorities from leaving a highway bridge open so that the general public could not pass over it. *Crowder* v. *Tinkler,* 19 Ves. Jr. 618, involved an injunction to prevent the defendants from using certain premises as a powder magazine on the ground that it was a public nuisance, it having been erected near a public road and the premises of the plaintiffs, and having also been improperly constructed. This clearly involved a property right. It was so peculiarly and distinctively a bill of that kind that it was entertained at the instance of private parties. But the court, being of the opinion that the evidence did not make out a clear case of nuisance, directed an indictment to be drawn and the question put in issue, in the meantime withholding the injunction. This course was taken because courts of equity are reluctant to exercise this jurisdiction at all, and will not do so except in clear cases. The indictment was directed, not for the purpose of enforcing the criminal law, but to the end that, through it, the chancellor might know whether the carrying on of that trade was unlawful under all the circumstances, it not being *per se* a nuisance. Another extensive class of cases, cited in the text of Story's Equity Jurisprudence, is composed of those having for their object the vindication of public rights in respect to property, such as obstructions to highways, public grounds, harbors and landings. These obstructions are classed by the old writers as purprestures, signifying enclosures. One who erects a structure in a street, road, park, harbor or river or makes enclosures thereon, may be said to take over to himself, or enclose for his sole benefit, the portion so occupied, and withdraw it from the use and enjoyment of all the citizens, to the injury and detriment of the general public.

It may be no more to the detriment of one person than to another, so that no individual could enjoin the act as being peculiarly and especially injurious to him. In such cases, the attorney general may proceed in equity on behalf of the public to abate the nuisance, if it be one. Whether it be a criminal nuisance or not, is wholly immaterial. · If it is indictable as a crime, it does not bar the remedy in equity, because the citizen and the general public have an immediate right to the enjoyment of the thing interfered with. A criminal prosecution is inadequate in such cases, because it does not prevent the doing of the unlawful act. It 'may ultimately correct the wrong, but, while the process of correction is going on,. the public is deprived of an important and valuable right, wherefore the injury is irreparable. In such cases, it is not the criminality of the act that gives 'jurisdiction in equity, but the deprivation of personal and property rights interfered with, injured, destroyed or taken away by the unlawful act. For the mere vindication of the criminal law and the enforcement of the public policy of the state, let it be founded upon moral or other considerations, the legal remedy by indictment and prosecution is fully adequate and peculiarly appropriate. The decisions in this country awarding injunctions to abate purprestures, are numerous. The principle upon which they proceed underlies the decision in the notable case *In Re* Debs, 158 U. S. 564. After he had been committed for contempt in refusing to obey an injunction, Debs tested the jurisdiction in equity by a writ of *habeas corpus* from the federal supreme court. In reply to his contention, that court asserted right in the government to proceed by in junction to clear from obstruction the artificial highways of the country for the passage of interstate commerce and the transmission of the mails. Debs was the leader of a great strike of railway men and their organization and method of operation were such as to wholly prevent transportation of every kind through the city of Chicago and other places. The blockade or interference was as complete and effectual as would have been that of structures built entirely across the railroads. Though there were no buildings or structures interposed, there was an occupation of the railroads, the great common carriers of the country, so that nothing could pass. It wrought injury, personal and financial, to all the citizens of the United States, and deprived them of personal rights, such

as those of travel and communication. All this constituted more than a crime. It was a material, substantial, incalculable injury to the people. The interference produced the same results that would have come from the erection of buildings or other structures on the railroad so as to prevent transportation. It fell completely and perfectly within the definition of a purpresture. Other cases illustrating this doctrine are the following: *Inhabitants of Raridan* v. *Railroad Co.,* 49 N. J. 11; *People* v. *Vanderbilt,* 28 N. Y. 396; *Biddle* v. *Ash* (Pa.) 211; *People* v. *Beaudry,* 91 Cal. 213; *State* v. *Mobile,* 5 Porter (Ala.) 279.

By far the greater number of cases cited by Story are those of purpresture. All the balance involved injuries to property or to the health of individuals. Of course a direct injury to the health of an individual is not remedial by anything other than a preventive process. Besides, offensive trades or pursuits, poisonous and injurious to the health affect the property of citizens in the vicinity thereof, detracting from the right of enjoyment of dwellings, and interfering with trade in business houses, and sequentially impairing the value of the properties. All these elements enter into the cases holding it to be within this branch of equity jurisdiction.

Such has been the interpretation by the American courts, including the Supreme Court of the United States. *Mugler* v. *Kansas,* 123 U. S. 623, is relied upon by counsel for the appellee as having interpreted it otherwise, but it does not do so. The statute, involved, expressly conferred the jurisdiction exercised in that case, namely, to prevent the use of real estate in the manufacture of intoxicating liquors. It declared all places where intoxicating liquors were manufactured, sold, bartered or given away, in violation of the provisions of the act, to be common nuisances, and authorized the attorney general, county attorney or any citizen of the county, in which such nuisance existed, to sue in the name of the state to abate and perpetually enjoin it. Plainly this was a jurisdiction created by statute. It is true that Mr. Justice Harlan, in the discussion of the case, refers to the text in Story as justifying such use of the writ of injunction, but the main purpose of that argument was to sustain the constitutionality of the statute giving the remedy. In *Commonwealth* v. *McGovern,* 116 Ky. 212, the court granted an injunction to prevent the use of certain premises for the holding of

a prize fight on the ground that such use of the property would constitute a public nuisance, but declared, at the same time, that it could not grant an injunction to prevent the prize fight, because the process of the criminal court was adequate for that purpose. .It limited the injunction to the prevention of the illegal use of the property only, and this was done under a statute which enjoined upon all judges of courts the duty to suppress or prevent prize fights by the exercise of all the powers vested in them for the prevention of crime. The court interpreted this statute as inhibiting the use of real property for the maintenance or giving of a prize fight. In *Cella* v. *People,* 112 Ill. App. 376, an injunction was awarded to restrain the maintenance of a pool-room, a turf exchange, similar to the one involved here, in the village of Venice, just across the river from the city of St. Louis. But, in that case, the court emphasized the want of equity jurisdiction to prohibit the mere commission of the offense of operating the pool-room or the repetition thereof. It entertained jurisdiction and awarded the injunction however, on the ground that the maintenance of the turf exchange at that place was a civil nuisance because the evidence showed that the citizens of the village were greatly annoyed and disturbed by the existence and operation thereof and that direct financial injury to real estate in the vicinity resulted from it. In closing its opinion, the court said: "In our opinion, unless the relief prayed in the bill can be granted, the evidence warrants the conclusion that the law-abiding citizens most directly interested in this case, will be driven to the alternative of continuing to suffer intolerable annoyance and disturbance and great financial injury amounting to an insufferable nuisance, or of disposing of their property and business for what it may bring, and abandoning their homes and going with their families elsewhere, to their great loss, to the great public loss to the community in question and to the state." Among other things, it was alleged and proven that the operation of the pool room interfered with the operation of mills and factories in the community by attracting the employes therefrom. The Kentucky and Illinois cases just analyzed are all we have found which go even to the extent of their holdings, and, in both of them, the inability of a court of equity to enjoin the mere commission of crime, or to abate mere criminal nuisances, when the vindication of no personal or prop-

erty right is involved, is reiterated and emphasized. They adhere to the long line of cases asserting it, among which are the following: *State* v. *Uhrig,* 14 Mo. App. 413, holding that equity will not restrain the keeping of an unlicensed dram shop, though the keeping of it is a public nuisance; *Cope* v. *Fair Ass'n,* 99 Ill. 489, refusing an injunction to restrain gambling at a fair; *People* v. *Condon,* 102 Ill. App. 449 refusing an injunction to restrain gambling, pool selling, &c., *Tiede* v. *Schneidt,* Wis. 201, refusing an injunction to prevent the keeping of slaughter houses on the banks of a running stream or depositing therein dead animals, such acts being illegal, but no injury to property or property rights being alleged; *Ocean City Ass'n* v. *Schurch,* 57 N. J. Eq. 268, refusing an injunction to restrain the breach of a covenant on the ground that the act covenanted against was criminal, injury to property resulting therefrom having been waived. To these authorities may be added a dictum of the United States Supreme Court in the *Debs Case,* 158 U. S. 564, saying: "Again it is objected that it is outside the jurisdiction of a court of equity to enjoin the commission of crimes. This, as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the law of the land is necessary to call into exercise the injunctive powers of the court. There must be some interference, actual or threatened, with property rights of a pecuniary nature; but when such interferences appear, the jurisdiction of a court of equity arises, and is not destroyed by the fact that they are accompanied by or are themselves violations of the criminal law."

That criminal procedure and remedies are adequate to maintain and uphold the public right in so far as moral and political principles and general state policy are involved, is perfectly obvious. In cases of criminal nuisances, there may be, on conviction of the defendant, a judgment of abatement, effectually preventing repetition. 1 Bishop Cr. Law, sec. 1079; *State* v. *Noyes,* 10 Foster (N. H.) 279; *Wroe* v. *State,* 8 Md. 416; *Rex* v. *Stead,* 8 Term Rep. 142; *Barclay* v. *Commonwealth,* 25 Pa. 503; *Crippen* v. *People,* 8 Mich. 117. It is also competent for the legislature, within the constitutional limits of its power, to declare any act criminal and make the repetition or continuance thereof

a public nuisance, so as to enable the courts, on conviction, to pronounce judgments of abatement, or to vest in courts of equity the power to abate them by injunction; but it is not the province of the courts to ordain such jurisdiction for themselves. We have some statutes of that character now relating to violation of the laws regulating the liquor traffic, and others. They stand on the principle underlying the Kansas statute, construed and upheld in *Mugler* v. *Kansas,* cited.

It would be a waste of time to examine and discuss the numerous cases, declaring the maintenance or operation of a gaming house a criminal nuisance, and as such indictable. Its criminality gives no right to injunction. An additional element, not shown by this bill, is required, namely, some injury to property or person. Immorality is not enough. There is a broad distinction between immoral acts and those injurious to health. A man can keep himself pure in an immoral atmosphere, but he cannot keep himself well in a poisonous atmosphere. Immorality does not kill, or injure the body.     Foul air or poisonous water does. If we should sustain an injunction on the ground that the act is immoral as well as criminal, we would be bound to award it in all criminal cases, for, in every instance, there is some reason, affecting the body politic, for prohibiting acts and making the commission thereof criminal, and soon there would be no distinction between courts of law and courts of equity in respect to criminal jurisdiction.

From the principles and conclusions stated, it results that the decree, complained of, must be reversed, the preliminary injunction dissolved and the bill dismissed.

*Reversed, and Bill Dismissed.*